Filed 5/25/22  In re April S. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re APRIL S. et al., Persons Coming Under the Juvenile Court Law. | B314127 (Los Angeles County Super. Ct. No. 19LJJP00459A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. FELIPE S. et al., Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Michael C. Kelley, Judge.  Affirmed.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant Felipe S.

Carolyn S. Hurley, under appointment by the Court of Appeal, for Defendant and Appellant Maria S.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Appellants Maria S. (mother) and Felipe S. (father) appeal from the juvenile court's orders terminating parental rights over their children, April (born 2011), Ariel (born 2016), and Adan (born 2017) and freeing the children for adoption. Both parents contend the orders must be reversed because (1) the beneficial parent-child exception to terminating parental rights applies, (2) legal guardianship should have been considered as an alternative, and (3) a proper inquiry under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) was not undertaken.

We affirm the juvenile court's orders.

## BACKGROUND
**Detention and Welfare and Institutions Code[1] section 300 petition**

The Los Angeles County Department of Children and Family Services (the Department) received a referral in June 2019 alleging drug abuse and domestic violence by the parents. When the social worker responded to the referral, the

---

[1] All further statutory references are to the Welfare and Institutions Code, unless stated otherwise.

children were living with their paternal grandmother. The paternal uncle was also involved in the children's care. The family had previously been living in the maternal grandfather's home. The parents initially agreed to have the paternal grandmother become the children's legal guardian but changed their minds after an argument with the paternal uncle.

In early July, mother and father signed an affidavit allowing the children to be removed from their care and placed with maternal aunt Angeles R. pending a detention hearing. The maternal aunt lived with her partner, Sara B., and Sara's family.

On July 9, 2019, the Department filed a petition under section 300, subdivision (b), alleging the parents' history of substance abuse and current abuse of amphetamine and methamphetamine rendered them incapable of providing regular care for the children and placed the children at risk of harm. The petition further alleged that mother had mental and emotional problems, including a diagnosis of depression and suicidal ideation, had attempted suicide in the past, and had been previously hospitalized for evaluation and treatment of a psychiatric condition. The petition alleged that father knew of mother's condition and failed to protect the children.

At the July 10, 2019 detention hearing, the juvenile court found father to be the children's presumed father. Both parents filed ICWA-020 Parental Notification of Indian Status forms in which they denied knowledge of any Indian ancestry. The Department's detention report indicated that during a June 13, 2019 interview with the social worker, mother and father had denied any Indian ancestry. The juvenile court found it had no reason to know ICWA applied but advised the parents to make

3

their attorneys, the Department, and the court aware of any new information concerning possible ICWA status.

The juvenile court then ordered the children detained from parental custody. The court granted the parents monitored visitation a minimum of three times per week, three hours per visit, limited only by the availability of a monitor.

**Jurisdiction and disposition**

The children remained placed with maternal aunt at the time of the August 19, 2019 adjudication hearing. Maternal aunt was willing to become the children's legal guardian if the parents failed to reunify.

Mother and father both pleaded no contest to the allegations of the petition, which the juvenile court amended by interlineation. The sustained allegations state that the children were at substantial risk of abuse or neglect because of the parents' methamphetamine abuse, mother's mental and emotional problems, and father's failure to protect the children from mother's mental and emotional problems.

The juvenile court declared the children to be dependent children and removed them from parental custody. The court ordered both parents to enroll in a full drug and alcohol program with weekly random testing and aftercare, conjoint counseling, and parenting classes. The court ordered mother to enroll in individual counseling and psychiatric services and to comply with the recommendations of her mental health provider. Both parents were granted monitored visits a minimum of nine hours per week.

**Review proceedings**

The Department reported in February 2020 that the children remained in the care of maternal aunt, to whom they were bonded.

Mother had been accepted into a drug court program in August 2019 but was discharged from the program in October 2019 when she tested positive for methamphetamine and refused to enroll in residential treatment.  Mother thereafter completed an outpatient substance abuse program but tested inconsistently for drugs.  She had either tested positive or failed to appear for 12 out of 18 scheduled tests.  Father had tested positive for methamphetamine in October 2019 and had not complied with his case plan.

Mother and father visited regularly with the children.  The parents arrived on time for all scheduled visits and were attentive to the children's needs.  The social worker observed that the children appeared comfortable and were affectionate toward the parents.

At the six-month review hearing held on February 19, 2020, the juvenile court continued reunification services for both parents.

In August 2020, the Department reported that the children were closely bonded with maternal aunt.  The social worker observed that Adan was comforted by maternal aunt's presence and reached for her to pick him up.  When maternal aunt did so, Adan rested his head on her shoulder.

The maternal aunt updated the Department on the children's participation in services.  Adan was receiving weekly regional center services.  Ariel had completed mental health services and had been referred for speech evaluation.  April was

participating in weekly therapy.  Her therapist reported that April had expressed mixed feelings about returning to the parents.  When the social worker asked April if she wanted to live with mother and father, April responded, "sometimes yes, but not all the time."  April explained that the parents did not have a house and that she liked living in her present home.  When asked if she had any other concerns about living with her parents, April responded, "they fight."

Mother and father were in partial compliance with their case plans.  Both parents had drug-tested inconsistently.  Mother had completed an outpatient substance abuse program and was enrolled in individual counseling.  The parents had not begun conjoint counseling.  Mother explained they were waiting for father to complete his substance abuse program.

The parents' in-person visits with the children were suspended in March 2020 because of COVID-19.  The in-person visits were replaced by daily video visits.  By July 2020 the parents' video visits with the children became more sporadic.  On August 24, 2020, the juvenile court ordered the Department to prepare an update on the parents' progress and continued the matter to September 29, 2020.

The Department reported in September 2020 that mother and father had enrolled in a 12-week parenting class and had attended three of four sessions.  Both parents failed to appear for eight scheduled drug tests.

In-person visits between the parents and children resumed in August 2020.  The social worker monitored weekly two and a half-hour visits on Tuesdays, and the maternal aunt monitored weekend visits.  The social worker noted that the parents did not effectively manage the children's tantrums and aggressive

6

behaviors.  The parents would admonish the children not to hit one another, but would engage in rough play with them immediately thereafter.  The social worker observed that Adan began biting both mother and his siblings upon the parents' arrival at an August 2020 visit.  Mother admonished Adan not to bite but then rolled on the ground with the children as they pushed and climbed atop one another.  Adan slapped mother on the face several times and was aggressive with his siblings and with mother throughout the visit.  He cried at the end of the visit and refused to get into his car seat.

When the social worker asked maternal aunt about Adan's behavior, she responded that Adan exhibited behavioral issues after in-person visits with the parents.  He had begun hitting and biting other children at childcare.  At home, Adan would refuse to follow instructions, throw tantrums, and cry, asking for the parents.  His disruptive behaviors subsided two or three days after parental visits.  Maternal aunt further stated that the parents "baby" the children, who then regress, mumbling and speaking like babies when with the parents.  The children then had difficulty transitioning back to maternal aunt's home, where they were not allowed to engage in such behaviors.

Mother testified at the September 29, 2020 12-month review hearing.  She said she visited consistently with the children; and when in-person visits were suspended, she and the children participated in video visits that lasted between 30 and 40 minutes.  Mother stated that April sometimes appeared distant during the video visits and would not want to talk to her.  She added that video visits with the younger children were sometimes very short.  When in-person visits resumed in August 2020, mother did not miss a single visit.  Mother said the

children were affectionate with her. She was never told that the visits were inappropriate or had not gone well.

At the conclusion of the hearing, the juvenile court found both parents to be in partial compliance with their case plans and that neither parent had made significant progress in resolving the problems that led to the children's removal. The court terminated reunification services and set the matter for a permanency planning hearing.

**Section 366.26 proceedings**

The Department reported in January 2021 that maternal aunt and her partner were strongly committed to adopting the children. The Department noted that the children were closely bonded with their caregivers, with whom they had been placed since early July 2019.

The Department reported in March 2021 that April said she was "happy" living with maternal aunt. Ariel also said she "like[s] living with my auntie." Adan appeared happy and comfortable in maternal aunt's home. The social worker observed the children hugging maternal aunt and looking to her for comfort. Maternal aunt responded by hugging the children in return and giving them her attention.

Maternal aunt reported that father continued to call the children on a weekly basis, but mother's calls had become less frequent. Both parents attended in-person weekly visits. When asked if any of the children cried at the end of the visits, maternal aunt responded no, the children had adjusted to the routine.

At the March 29, 2021 hearing, the juvenile court identified adoption as the appropriate permanent plan.

In a May 2021 addendum report, the Department reported that maternal aunt and her partner were closely bonded with the children and were strongly committed to adopting them. Maternal aunt said she would continue mother's visits with the children after the adoption. April told the social worker that she wanted to be adopted by maternal aunt and to continue living with her. April said she did not want to live with mother.

On May 27, 2021, the juvenile court set the matter for a contested section 366.26 hearing. The court ordered the Department to interview April and to prepare a supplemental report.

In a last minute information for the court, the Department reported that when the social worker asked April on May 28, 2021, whether she wanted to live with mother, the child said, "Kind of." April responded "yes" when asked if she wanted to continue living with maternal aunt. In a June 12, 2021 interview, April told the social worker she wanted to be adopted by her caregivers. April identified her caregivers as people she could trust and speak to about anything. When asked if she felt the same way about mother, April responded, "no."

**Section 366.26 hearing**

Father did not attend the July 12, 2021 section 366.26 hearing. Mother was present and testified that she and father had in-person weekend visits with the children that lasted between two to three hours. Mother said that when the children see mother and father, they run toward the parents and scream, "Mommy, Daddy, we love you." She described her relationship with the children as "amazing." During the visits, the children show mother their art projects and tell her about what they had learned in school. Mother testified that she also had daily

9

telephone contact with the children and maternal aunt. Mother said she and maternal aunt had a good relationship and communicated regularly about the children's health and their progress in school.

After hearing argument from counsel, the juvenile court found by clear and convincing evidence that the children were adoptable. The court then noted that the California Supreme Court had recently "clarified the standard that applies" when assessing the beneficial parent-child exception to terminating parental rights. The juvenile court found that mother had "probably carried her burden of demonstrating regular visitation" with the children but noted that "the key issue" was "whether it's in the child's best interest to avoid adoption and preserve the parental bond and the parental relationship."

The juvenile court observed that "[w]hile mother's visits are generally good, her monitoring of school progress does not really equate with actually being a parental figure and being responsible for the day-to-day oversight of the child's progress in school." The court found significant April's clearly stated preference to be adopted: "She is the oldest child. She was in mother's care the longest. And she is quite clear . . . that she would, in fact, like to be adopted. . . . And given that the other two children are even younger and were in mother's care for much short[er] periods of time, I think the inference is quite strong that there is not the kind of bond between mother and the children that would not be compensated [by] the security of a new and permanent adoptive home." The juvenile court found no exception to adoption applied and terminated parental rights. The court responded in the affirmative to a request by father's

10

counsel that the minute order "reflect that the termination of parental rights is also over father's objection."

This appeal followed.

## DISCUSSION

### I. Beneficial parent-child exception

#### A. *Applicable law and standard of review*

Once a juvenile court has terminated reunification services and determined that a child is adoptable, the court is required to terminate parental rights unless it finds an applicable exception. (§ 366.26, subd. (c)(1).) The exception at issue here, sometimes referred to as the beneficial parent-child exception, applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The parent bears the burden of proving that the exception applies. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952-954.) To do so, the parent must prove three statutory elements: "(1) regular *visitation and contact*, (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

For the first element, visitation, the question is simply whether the parent visited consistently, as permitted by court orders. The focus is not on punishing or rewarding parents for their behavior in visiting or maintaining contact, but on the best interests of the child. (*Caden C., supra*, 11 Cal.5th at p. 632.)

11

As to the second element, whether the child would benefit from continuing the relationship, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) The parent must also show that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) Relevant factors in assessing the parent-child relationship include "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Id*. at p. 576.) For the third element, whether termination would be detrimental to the child, the court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra*, at p. 633.)

We review the juvenile court's findings concerning visitation and whether the child would benefit from continuing the relationship with the parent for substantial evidence. (*Caden C., supra*, 11 Cal.5th at pp. 639-640.) Whether termination of parental rights would be detrimental to a child because of the child's relationship with the parent is a question we review for abuse of discretion. (*Ibid.*)

### B. *Father forfeited any claim that the exception applies to him*

Father forfeited any appellate challenge based on the beneficial parent-child exception by failing to raise the issue in

12

the juvenile court below.  An appellant's failure to raise a statutory exception to termination at the section 366.26 hearing forfeits the issue on appeal.  (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 292.)  Father's counsel's request that the court's minute order "reflect that the termination of parental rights is over father's objection" was insufficient to preserve the issue for appellate review.

We decline father's request to excuse his failure to raise the exception in the juvenile court.  While an appellate court has discretion to review claims not raised in the trial court that present important legal issues, that "discretion must be exercised with special care," particularly in dependency matters where "considerations such as permanency and stability are of paramount importance."  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)  A determination concerning the beneficial parent-child exception raises factual questions that are unsuitable for resolution on appeal.  We therefore decline to exercise our discretion to excuse father's forfeiture of the issue.

**C.**      ***Substantial evidence supports the finding that the children did not share a substantial, positive emotional attachment with mother that would not be outweighed by the permanency of an adoptive home***

The juvenile court found, and the parties do not dispute, that mother met her burden of showing regular visitation with the children.  The issue is whether mother met her burden of proving that the children shared a substantial, positive emotional attachment with her that would not be outweighed by the security and permanency of an adoptive home.  Substantial

13

evidence supports the juvenile court's finding that mother did not sustain this burden.

At the time of the section 366.26 hearing, the children had been placed with their prospective adoptive parents for two years—most of Adan's and Ariel's young lives. All three children were closely bonded to their caregivers. April, the oldest child who had lived with mother the longest, clearly and unequivocally stated that she wanted to be adopted and did not want to live with mother. April identified her prospective adoptive parents as people she could trust and speak to about anything. She denied that mother was such a person.

That the children were affectionate and comfortable with mother during visits is insufficient to satisfy mother's burden of demonstrating that the children shared a substantial, positive emotional attachment with her that would not be outweighed by the benefits of adoption. To meet this burden, "[a] parent must show more than frequent and loving contact or pleasant visits." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) The positive aspects of the children's visits with mother were also offset by negative behaviors the children exhibited during and after the visits. When in-person visits resumed after the COVID-19-related hiatus, the children had difficulty transitioning back to their caregivers' home and to childcare after the visits. Adan began exhibiting behavioral issues, hitting and biting other children at childcare and throwing tantrums at home. Adan also exhibited aggressive behaviors during visits with mother. He bit his siblings and mother and slapped mother in the face.

Mother's claim that the juvenile court erroneously based its decision on the fact that she did not occupy a "parental role" in the children's lives is unavailing. Some appellate courts have

14

expressed concern that a juvenile court's use of that term or similar terms such as "parental relationship" in the context of the beneficial parent-child exception suggest that an improper legal standard was applied. (See *In re J.D.* (2021) 70 Cal.App.5th 833, 864 (*J.D.*) [juvenile court's conclusory determination that mother's relationship with child did not "'amount to a parental bond'" did not address whether child had a substantial, positive emotional attachment to parent]; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1229-1230 [questioning whether juvenile court improperly "equated a parental role, as it related to application of the parent-child relationship exception, with the ability to parent 'on a fulltime basis'"].) That concern is not present here.

The juvenile court here stated on the record the relevant factors delineated by the Supreme Court in *Caden C., supra*, 11 Cal.5th 614 for determining whether the beneficial parent-child exception applies. It then applied those factors. The juvenile court's observation that mother did not occupy a "parental role" does not persuade us that the court applied an incorrect legal standard in this case.

We reject mother's argument that the record contained insufficient facts for the juvenile court to assess the strength of her bond with the children as an improper request to reweigh the evidence. Under the applicable standard of review, we must uphold the juvenile court's findings if, on the entire record, there is substantial evidence to support those findings. We do not reweigh the evidence; rather, we draw all reasonable inferences in support of the findings and view the record in the light most favorable to the juvenile court's order. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.)

15

*J.D., supra,* 70 Cal.App.5th 833, on which mother relies as support for her position, is distinguishable. The mother in that case presented evidence that her five-and-a-half-year-old son, who had lived with mother for half of his life, was clearly bonded to her and remained bonded to her throughout the case. (*Id.* at p. 856.) That evidence included reports from a family therapist who observed that mother and children "'appear to have a positive and affectionate relationship,'" agency reports noting that the children "'come back from their visit[s] happy,'" and a caregiver's statement acknowledging the child's positive bond with mother. (*Ibid.*) Such evidence is not present in this case. To the contrary, the record shows that April, mother's oldest child, who had lived with her the longest, was ambivalent about returning to mother's care. She stated unequivocally, however, that she wanted to remain with her maternal aunt and to be adopted by her. Unlike the children in *J.D.* who returned happy from their visits with their mother, the children in this case engaged in regressive or disruptive behaviors after parental visits. Adan exhibited aggressive behaviors, throwing tantrums at home and biting and hitting other children at daycare.

Substantial evidence supports the finding that the children did not share a substantial, positive, emotional attachment with mother that would not be outweighed by the benefits of a permanent adoptive home with their maternal aunt.

**D.    *No abuse of discretion in juvenile court's determination that terminating parental rights would not be detrimental to the children***

The juvenile court did not abuse its discretion by concluding that terminating parental rights would not be detrimental to the children. The relevant inquiry in this

16

determination "is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra*, 11 Cal.5th at p. 633.)

There is substantial evidence in the record that the children's interests would be best served by the stability of adoption with their current caregivers, who met the children's daily physical and emotional needs. Maternal aunt accompanied the children to their medical appointments, therapy sessions, and regional service providers. The children looked to their maternal aunt for comfort and assurance, and she responded by hugging them and giving them her time and attention. The children were closely bonded to their caregivers. April repeatedly and unequivocally stated that she wished to be adopted by her caregivers and to remain in their home. In contrast, she expressed ambivalence about returning to mother.

That the children enjoyed visiting with the parents and referred to them as "mommy" and "daddy" is insufficient to show that terminating the parental relationship would be detrimental. "Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) The record here shows that the children shared day-to-day interaction, companionship, and experiences with their maternal aunt, not with their mother.

The juvenile court did not abuse its discretion by terminating parental rights.

### E. *Legal guardianship*

We reject mother's contention that the juvenile court erred by not considering legal guardianship as the children's permanent plan. Adoption is the preferred permanent plan once a finding of adoptability has been made. (§ 366.26, subd. (c)(1); *In re S.B.* (2009) 46 Cal.4th 529, 532.) Legal guardianship is an alternative to adoption when a "child is living with a relative who is unable or unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment through legal guardianship." (§ 366.26, subd. (c)(1)(A).) Those circumstances do not exist here. The children's caregivers here, maternal aunt and her partner were strongly committed to adopting the children.

### F. *Sibling relationship exception*

We need not address mother's argument that the sibling relationship exception requires reversal of the juvenile court's order if this court were to find that terminating parental rights would be detrimental to one child but not to the others. No such finding is warranted.

## II. ICWA

Both parents contend the order terminating parental rights must be reversed because the Department and the juvenile court failed to ask extended family members, specifically, the paternal grandmother, paternal uncle, maternal grandfather, and maternal aunt, whether the children are or may be Indian children under ICWA. The Department concedes that it failed to

18

fulfill its statutory duty of initial inquiry by not asking these extended family members about the children's possible Indian status. The failure to do so was error. We conclude, however, that the error was not prejudicial, given the parents' disclaimer of any knowledge of Indian ancestry and the absence of any indication in the record that there was readily obtainable information likely to bear meaningfully upon whether the children are Indian children. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744 (*Benjamin M.*).)

A. ***Applicable law***

ICWA and related California statutes reflect the Legislature's intent "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families." (25 U.S.C. § 1902; see *In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.) An "Indian child" is defined as any unmarried person under the age of 18 who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subds. (a), (b).)

"Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate certain inquiries to be made in each case. These requirements are sometimes collectively referred to as the duty of initial inquiry." (*Benjamin M., supra*, 70 Cal.App.5th at p. 741.) "The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) The court and child welfare department

19

"have an affirmative and continuing duty" to inquire whether a child for whom a petition under section 300 may be or has been filed may be an Indian child.  (*Ibid.*)

Under California law, the child welfare department's initial duty of inquiry includes, but is not limited to, "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."  (§ 224.2, subd. (b).)  Under ICWA, the term "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or  nephew, first or second cousin, or stepparent."  (25 U.S.C. § 1903(2).)

The juvenile court must also inquire at each participant's first appearance in court whether the participant knows or has reason to know that the child is an Indian child.  (§ 224.2, subd. (c).)  In addition, the juvenile court must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.  (§ 224.2, subd. (c).)

If the "initial inquiry creates a 'reason to *believe'* the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.'  ([§ 224.2,] subd. (e), italics added.)  [I]f that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply.  (See § 224.2, subd. (c) [court is obligated to

inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

Neither the duty of further inquiry nor the ICWA notice provisions are at issue here because no one contends there is reason to know the children are Indian children.

B.    *No prejudicial error*

The parents' ICWA challenge is based on the Department's failure to ask extended family members (the maternal grandfather, paternal grandmother, paternal uncle, and maternal aunt) about potential tribal membership.  The juvenile court's alleged dereliction of its duty is the failure to ensure a proper inquiry by the Department.  The statutory duty to ask extended family members about a child's possible Indian heritage is imposed by California law on child welfare agencies only. (§ 224.2, subd. (b).)  Federal law imposes no such duty.  (*In re S.S.* (2022) 75 Cal.App.5th 575, 581 (*S.S.*); *In re A.C.* (2021) 65 Cal.App.5th 1060, 1069.)  The failure to inquire of extended family members accordingly is an error under state law only. Under California law, we may not reverse unless we find that error was prejudicial.  (Cal. Const., art. VI, § 13; *Benjamin M., supra,* 70 Cal.App.5th at p. 742.)

In determining whether the failure to conduct a proper ICWA inquiry was prejudicial, several appellate courts have held that reversal is warranted only when the record indicates there was readily obtainable information that was likely to bear

21

meaningfully upon whether the child is an Indian child. (*Benjamin M., supra*, 70 Cal.App.5th at p. 744; *In re A.C.* (2022) 75 Cal.App.5th 1009, 1017 [applying *Benjamin M.* court's standard for prejudice]; *In re Darian R.* (2022) 75 Cal.App.5th 502, 509 [same]; *S.S., supra*, 75 Cal.App.5th at p. 581 [same].)

The courts in *In re Antonio R.* (2022) 76 Cal.App.5th 421, 435-436 (*Antonio R.*), and *In re H.V.* (2022) 75 Cal.App.5th 433, 438 (*H.V.*), adopted a different standard, holding that the Department's failure to interview extended family members during its initial ICWA inquiry was prejudicial error and therefore either reversible per se (*H.V.*) or above such a low bar for prejudice that it was reversible (*Antonio R.*). In *Antonio R.*, the parents both denied knowledge of any Indian ancestry. The Department spoke with a paternal great-grandmother, who also denied knowledge of any Indian ancestry. The Department did not inquire about possible Indian ancestry with any maternal extended family members, including the maternal grandparents, who were designated as the prospective adoptive parents, and maternal aunts and a maternal uncle, who were present at the disposition hearing. The court in *Antonio R.* concluded that the failure to do so was prejudicial error.

In *H.V.*, the only person asked about possible Indian ancestry was the minor's mother, who filed an ICWA-020 form denying knowledge of any Indian ancestry and informed the juvenile court that the minor's alleged father (who did not appear) had no Indian ancestry. Although the Department interviewed the minor's maternal great-grandmother and maternal great-grandfather, the record did not indicate whether the social worker asked any of these relatives about the minor's

possible Indian ancestry. The court in *H.V.* concluded that the failure to do so was prejudicial and reversible error.

We decline to adopt the standard applied by the courts in *Antonio R.* and *H.V.* We apply instead the standard for prejudicial error articulated by the court in *Benjamin M., supra*, 70 Cal.App.5th 735.

The record in this case reveals no readily obtainable information that was likely to bear meaningfully on whether the children were Indian children, and neither parent asserts that such information exists. Both mother and father told the social worker that they had no knowledge of any Indian ancestry. Both parents filed ICWA-020 forms stating they had no Indian ancestry to their knowledge. Both parents appeared at the detention hearing at which the juvenile court found, based on the parents' representations, that it had no reason to know that ICWA applied. Both parents were instructed by the juvenile court to make the court, the Department, and the parents' attorneys aware of any new information concerning possible ICWA status. Both parents were in contact during the case with paternal and maternal extended family members. The family lived in the maternal grandfather's home at the outset of the case. The children moved to the paternal grandmother's home in June 2019 and the parents initially agreed to have the paternal grandmother assume legal guardianship over the children. The children were then placed with maternal aunt, who monitored the parents' visits with the children and with whom the parents remained in contact throughout the case. Neither parent brought to the Department's or the juvenile court's attention any additional information relevant to ICWA.

*Benjamin M., supra*, 70 Cal.App.5th 735, *In re Josiah T.* (2021) 71 Cal.App.5th 388, and *In re Y.W.* (2021) 70 Cal.App.5th 542 (*Y.W.*), on which the parents rely, are factually distinguishable. The father in *Benjamin M.* never appeared in court and was never asked whether he had reason to believe the subject minor was an Indian child. (*Benjamin M.*, at p. 744.) The child welfare agency never asked the father's brother and sister-in-law, whom the agency contacted in an effort to locate the father, about the minor's possible Indian ancestry. The court in *Benjamin M.* noted that the father's brother's knowledge of his own Indian heritage was likely to bear meaningfully on the father's status. (*Id.* at p. 745.) *Josiah T.* similarly involved a missing father who was not available to claim or deny Indian ancestry. (*Josiah T.*, at pp. 393-394, 403.) Although the paternal grandmother in that case claimed Cherokee ancestry, the agency then failed to disclose or follow up on that claim. Here, in contrast, both parents appeared in the juvenile court, both filed ICWA-020 forms denying any knowledge of Indian ancestry, and both repeatedly denied knowledge of any Indian ancestry. No extended family member, including paternal relatives with whom the children were initially placed and who wanted the children placed with them, claimed to have any Indian ancestry. Maternal aunt, with whom the children were subsequently placed and who wanted to adopt the children, also never informed the Department of any possible Indian ancestry.

In *Y.W., supra*, 70 Cal.App.5th 542, the mother, who was adopted, filed an ICWA-020 form stating she had no knowledge of Indian ancestry. The social services agency interviewed the adoptive maternal grandmother, who did not know whether mother's biological family had any Indian ancestry. The adoptive

24

maternal grandmother told the social worker that she knew the name of mother's biological father but had no additional information about him or his relatives. The adoptive maternal grandmother further stated she could obtain contact information for the mother's biological maternal aunt. The agency never followed up or sought to obtain further information about the mother's biological parents. (*Id.* at p. 549.) The court in *Y.W.* held that the agency's failure to do so was prejudicial error. (*Id.* at pp. 552-553.) In this case, neither parent was adopted, and mother and father repeatedly denied any knowledge of Indian ancestry.

*In re A.C., supra*, 75 Cal.App.5th 1009, another recently decided case, is distinguishable for similar reasons. Like the adopted mother in *Y.W.*, the mother in *A.C.* lived in foster care, separated from her biological relatives much of her life. Although the mother in *A.C.* denied knowledge of any Indian ancestry during an initial interview with the social worker and filed an ICWA-020 form indicating she had no known Indian ancestry, the Department nevertheless concluded for unidentified reasons that ICWA "'may apply.'" (*Id.* at p. 1013.) There was no indication that the Department conducted an ICWA inquiry of any extended family members, including a maternal cousin and maternal aunt with whom the minors were placed. (*Ibid.*) The appellate court noted that the mother, who was a product of foster care, may not have known her cultural heritage, whereas the same was not true of the maternal relatives. The court therefore held that the Department's failure to ask the maternal relatives about possible Indian ancestry constituted prejudicial error. (*Id.* at p. 1017.)

25

Cases cited by father, *In re T.G.* (2020) 58 Cal.App.5th 275 and *In re S.R.* (2021) 64 Cal.App.5th 303, are equally distinguishable. The courts in those cases found prejudicial error when the agency failed to conduct a further ICWA inquiry of extended family members after a claim of Indian ancestry. (*T.G., supra*, at pp. 282-285 [mother claimed Cherokee heritage]; *S.R., supra*, at pp. 308, 310, 315-316 [maternal grandmother reported that maternal great-grandmother was a member of federally recognized tribe].) No claim of Indian ancestry was made in this case.

The facts here are similar to those in *In re Darian R., supra*, 75 Cal.App.5th 502 and *S.S., supra*, 75 Cal.App.5th 575. In *Darian R.*, both parents filed ICWA-020 forms denying knowledge of Indian ancestry, and the juvenile court ordered the parents to keep the Department and the court apprised of any new information relating to possible ICWA status. The court rejected the mother's argument that the Department's failure to interview the maternal grandfather and maternal aunt about their Indian ancestry was prejudicial. The court noted that in a previous dependency case, the juvenile court had found ICWA did not apply to two of the three children, that all three children had the same parents, and hence, the same ancestry. (*Darian R.*, at p. 509.) The court in *Darian R.* further noted that the mother at various times had lived with the maternal relatives she claimed the Department failed to interview and that she had been ordered to continue to update the Department and the court with any information relevant to ICWA. (*Darian R.*, at p. 510.) Here, as in *Darian R.*, the children and the parents lived with maternal and paternal relatives at the outset of the case. Mother and father also had ongoing contact with maternal aunt, with whom

the children were subsequently placed.  The parents were instructed to continue to provide relevant ICWA information to the Department and the juvenile court.  After denying any Indian ancestry, mother and father provided no additional ICWA information.

In *S.S., supra*, 75 Cal.App.5th 575, the court concluded the Department's failure to ask the maternal grandmother about the child's possible Indian ancestry was not prejudicial because the maternal grandmother, the mother's counsel, and the minor's counsel had all requested placement with the maternal grandmother.  Under ICWA, when an Indian child is the subject of foster care or adoptive placement proceedings, preference must be given to a member of the Indian child's extended family.  (25 U.S.C. § 1915(a), (b).)  The requested placement, the court reasoned, gave rise to a strong incentive to bring to the juvenile court's attention any facts suggesting the minor was an Indian child.  The failure to do so implied that the maternal grandmother was unaware of such facts.  (*S.S., supra*, at p. 582.) The children in this case were initially living with paternal relatives with whom the parents wanted to have the children placed.  The children were subsequently placed with a maternal aunt who wanted to adopt the children.  Like the maternal grandmother in *S.S.*, the extended family members in this case had a similarly strong incentive to make the Department aware of any relevant ICWA information.

On the record presented here, we cannot conclude that the Department's failure to ask the maternal grandfather, paternal grandmother, paternal uncle, and maternal aunt about the children's Indian ancestry was prejudicial error.

27

**DISPOSITION**

The orders terminating parental rights and freeing the children for adoption are affirmed.

_____

CHAVEZ, J.

We concur:

_____

LUI, P. J.

_____

ASHMANN-GERST, J.